## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| SHAWN WALKER, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>GENERAL MOTORS LLC,<br><br>Defendant. | No. 2:21-cv-10324<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## I.    INTRODUCTION

1.    Plaintiff Shawn Walker, by and through counsel, brings this action on behalf of himself and all others similarly situated against GENERAL MOTORS LLC (hereinafter "General Motors," "GM," or "Defendant"). All allegations made in this complaint are based on investigation of counsel, except those allegations that pertain to Plaintiff's vehicles, which are based on personal knowledge.

2.    This consumer class action arises out of General Motors's failure to disclose a uniform and widespread defect in the 60 kWh 350 V lithium-ion battery (hereinafter the "Defective Battery"). The defect causes the high voltage battery to overheat when charged to full capacity and results in an unreasonable safety risk to the drivers and passengers of vehicles equipped with the Defective Battery. These vehicles (hereinafter "Class Vehicles") are the 2017, 2018, and 2019 models of the Chevrolet Bolt (hereinafter "Chevy Bolt" or "Bolt").

3.     The Defective Battery contains a serious manufacturing defect that causes the battery system to overheat when the battery is charged to full or nearly full capacity, putting the battery at risk of exploding or catching fire. This can result in catastrophic damage to the Class Vehicles, and it also causes an immediate safety risk to the vehicles' occupants and the property surrounding the vehicles.

4.     On November 13, 2020, after receiving numerous complaints regarding the Defective Battery, and despite knowing about the defect for years before doing anything about it, General Motors issued Recall No. 20V-701 (hereinafter, the "Recall" or "GM Recall") for the Class Vehicles.[1]

5.     The GM Recall proposes an "interim remedy" for the Class Vehicles: the Vehicles will be reprogrammed to limit the full charge of the Defective Batteries to 90% of the Batteries' actual capacity.[2] The revised capacity will result in the Class Vehicles having a lower driving range and needing to be charged more often. As a result, Class Vehicle owners and lessees have been burdened with vehicles that do not perform as advertised, and instead require additional charging time and maintenance.

6.     Due to the undisclosed Defective Battery, Plaintiff and Class Members were deprived of the benefit of their bargain in purchasing or leasing their Class Vehicles; further, Plaintiff and Class Members suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Plaintiff brings this action individually

---

[1] NHTSA, Part 573 Safety Recall Report 20V-701 (Nov. 13, 2020) [hereinafter Exhibit A].

[2] *Id.* at 3.

and on behalf of all other current and former owners or lessees of the Class Vehicles. Plaintiff seeks monetary damages and injunctive and other equitable relief for Defendant's misconduct related to the design, manufacture, marketing, sale, and lease of the Class Vehicles as alleged in this Complaint.

## II.  JURISDICTION AND VENUE

7.  **Subject Matter Jurisdiction.** This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and there are 100 or more class members who are citizens of different states from Defendant.

8.  **Personal Jurisdiction.** This Court has personal jurisdiction over GM because GM is headquartered in this District, and because a substantial part of the events, omissions, or misrepresentations giving rise to these claims emanated from this District.

9.  **Venue.** Venue is proper in this District pursuant to 28 U.S.C. § 1391 because GM is headquartered and transacts business in this District, and a substantial part of the events, transactions, and conduct giving rise to the claims occurred in and emanated from this District.

## III.  PARTIES

**A.  Plaintiff Shawn Walker**

10.  Plaintiff Shawn Walker is a citizen and resident of Phoenix, Arizona.

11.     On or about August 5, 2020, Mr. Walker purchased a used 2019 Chevy Bolt from Carvana in Tolleson, Arizona (for purposes of this section, "the Vehicle").

12.     Prior to his purchase, neither Defendant nor any of its agents, dealers, or other representatives informed Mr. Walker of the Defective Battery. Mr. Walker reasonably expected that the Vehicle, including its range, would function normally in accordance with Defendant's specifications and representations.

13.     Mr. Walker purchased the Vehicle for personal, family, or household use. Mr. Walker has always attempted to use the Vehicle in the normal and expected manner.

14.     Mr. Walker has never received any correspondence from GM regarding the Recall and recommended software update, and used his car normally for a period of several months.

15.     Mr. Walker learned of the recall from a Bolt owners' group on Facebook, which prompted him to contact GM via the EV Concierge Line to inquire about driving his Vehicle on a long-distance trip. He was informed that he should not make any drive that required him to charge his car beyond 90%, and GM insisted that Mr. Walker rent a car for his trip. Mr. Walker was also informed that he needed to return to a local dealership in order to have the software update applied to his Vehicle, which he did on December 8, 2020.

16.     As a result, Mr. Walker has been left with a vehicle with reduced range. Mr. Walker has suffered an ascertainable loss resulting from Defendant's concealment,

fraud, omissions, and refusal to correct the Defective Battery and did not receive the benefit of his bargain when he purchased the Vehicle. Had Mr. Walker known that the vehicle's range was achieved only at the risk of a catastrophic fire, or that the range would be decreased in order to mitigate the fire risk, he would not have purchased his Bolt.

## B.    Defendant General Motors LLC

17.    Defendant General Motors LLC is a Delaware limited liability company with its principal place of business at 300 Renaissance Ctr., Detroit, Michigan.

18.    General Motors is a motor vehicle manufacturer and a licensed distributer of new, previously untitled motor vehicles. GM is one of the "Big Three" American automakers. GM engages in commerce by distributing and selling new motor vehicles under the Chevrolet, Buick, GMC, and Cadillac brands throughout the United States.

19.    GM has designed, manufactured, imported, distributed, marketed, and leased a number of vehicles that feature the 60 kWh 350 V lithium-ion battery (hereinafter the "Defective Battery").

20.    From its headquarters in Detroit, Michigan, General Motors marketed the Class Vehicles and the Defective Battery.

## IV.    FACTUAL ALLEGATIONS

21.    In early 2016, General Motors introduced the Chevrolet Bolt EV (also known as the "Chevy Bolt") as "the 200-mile-range EV with cool connectivity that

people can actually afford."[3] The Bolt quickly gained a number of accolades, including the 2017 Motor Trend Car of the Year, North American Car of the Year, and Automobile Magazine 2017 All Star awards.[4] These awards touted the Bolt's range and cost—"the $30,000 . . . Bolt EV cut[] by more than half what an electric car with 238 miles range would have cost [in 2015]."[5]

22.     The impressive range of the Bolt was advertised as the result of an "unprecedented" partnership between Defendant GM and LG Corporation.[6] In late 2015, GM explained that:

> Offering consumers the first long-range, affordable EV, required an unprecedented supplier relationship combining expertise in infotainment, battery systems and component development with GM's proven in-house capabilities in electric motor design, battery control, system validation and vehicle body/system integration.
>
> Following joint planning and research, GM and LG Corp. brought the Chevrolet Bolt EV to reality.[7]

---

[3] Nicole Lee, *Presenting the Best of CES 2016 winners!*, ENDGADGET (Jan. 8, 2016) [hereinafter Exhibit B], https://www.engadget.com/2016-01-08-presenting-the-best-of-ces-2016-winners.html (last visited Dec. 10, 2020).

[4] *See, e.g.*, Jeff Cobb, *2017 Chevy Bolt's Trophy Case Is Filling Up*, HYBRIDCARS (Nov. 23, 2016) [hereinafter Exhibit C], https://www.hybridcars.com/2017-chevy-bolts-trophy-case-is-filling-up/ (last visited Dec. 10, 2020).

[5] *Id.*

[6] John Voelcker, *Bolt EV Powertrain: How Did GM And LG Collaborate On Design, Production?*, GREEN CAR REPORTS (Feb. 3, 2016) [hereinafter Exhibit D], https://www.greencarreports.com/news/1102176_bolt-ev-powertrain-how-did-gm-and-lg-collaborate-on-design-production (last visited Dec. 10, 2020).

[7] Kevin Kelly, *Chevrolet Develops Bolt EV Using Strategic Partnership*, Chevrolet: Pressroom (Oct. 20, 2015) [hereinafter Exhibit E], https://media.chevrolet.com/media/us/en/chevrolet/home.detail.print.html/content/Pages/news/us/en/2015/oct/1020-bolt.html (last visited Dec. 10, 2020).

23. LG Chem, an LG subsidiary, was included in the development of the Bolt "from the start," helping to achieve the "key element in driving down costs" by developing the battery.[8] LG Chem designed and produced the Bolt's battery at its South Korea facility.

**A.    Defendant's Marketing to Class Vehicle Owners and Lessees Emphasized the Battery Power and Range of the Chevy Bolt**

24. Increased range is critical to the success of an all-electric vehicle. Car and Driver describes range as "*the* all-important stat"—because electric vehicles "can't be driven as far on a single charge as most gas-powered cars can go on a tank of fuel," and because electric vehicle batteries "can't be rejuiced in the five minutes it takes to top up a car's tank at a gas station," increased range is one of the primary considerations for purchasers or lessees of electric vehicles.[9]

25. GM was aware of this consideration when marketing the Chevy Bolt. At the time of its release, the Chevy Bolt was marketed as having a travel range of 238 miles without recharging.[10] GM went to great lengths to prove that range, including

---

[8] Sam Abuelsamid, *New GM-LG Partnership On Chevy Bolt EV Shows Why Barra Is Resisting Fiat Merger*, FORBES (Oct. 21, 2015) [hereinafter Exhibit F], https://www.forbes.com/sites/samabuelsamid/2015/10/21/general-motors-and-lg-team-up-to-jointly-develop-2017-chevrolet-bolt-ev/?sh=3b73c2cd380d (last visited Dec. 10, 2020).

[9] Rich Ceppos, *FAQs for Electric Vehicle Shoppers*, CAR AND DRIVER (May 27, 2020) [hereinafter Exhibit G], https://www.caranddriver.com/shopping-advice/a32668797/ev-faqs/ (last visited Dec. 10, 2020).

[10] *See Chevrolet Bolt EV – 2017*, CHEVROLET NEWSROOM [hereinafter Exhibit H], https://media.chevrolet.com/media/us/en/chevrolet/vehicles/bolt-ev/2017.html (last visited Dec. 10, 2020).

taking a Car and Driver writer on a test drive "from Monterey to Santa Barbara, California, that spanned approximately 240 miles on coastal highways."[11]

26.     This marketing was particularly important for GM because around the same time as the release of the Bolt, Tesla released a comparable compact electric vehicle—the Tesla Model 3.[12] Both vehicles advertised a range of over 200 miles on a single charge, making them some of the "first [electric vehicles] that could conceivably function as a family's lone car."[13] The Model 3, however, advertised a significantly faster charging time than the Bolt—the Bolt's fastest charging option, the direct-current fast-charging capability, costs consumers an extra $750 and charges at roughly half of the rate of the Tesla Superchargers.[14]

27.     The slower charging time, combined with limited access to charging stations, meant that consumers would not be able to make longer trips with the Bolt

---

[11] Joey Capparella, *2017 Chevrolet Bolt EV First Drive*, CAR AND DRIVER (Sept. 13, 2016) [hereinafter Exhibit I], https://www.caranddriver.com/reviews/a15099295/2017-chevrolet-bolt-ev-first-drive-review/ (last visited Dec. 10, 2020).

[12] *See* Bradley Berman, *EV Comparison: Tesla Model 3 vs. Chevy Bolt*, INSIDEEVS (Oct. 25, 2018) [hereinafter Exhibit J], https://insideevs.com/reviews/340642/ev-comparison-tesla-model-3-vs-chevy-bolt/ (last visited Dec. 10, 2020) (describing the Tesla Model 3 and the Chevy Bolt as the "two leading compact electric vehicles").

[13] Christian Seabaugh, *2017 Chevrolet Bolt EV vs. 2016 Tesla Model S 60: High-Voltage*, MOTORTREND (Oct. 31, 2016) [hereinafter Exhibit K], https://www.motortrend.com/cars/chevrolet/bolt-ev/2017/2017-chevrolet-bolt-ev-vs-2016-tesla-model-s-60/ (last visited Dec. 10, 2020) (comparing the Bolt to the Tesla Model S 60, a discontinued model that cost almost twice the price of the Bolt and the Tesla Model 3, in anticipation of the release of the Model 3, which the articles notes is a more appropriate comparison).

[14] Eric Tingwall, *2017 Chevrolet Bolt EV*, CAR AND DRIVER (Oct. 28, 2016) [hereinafter Exhibit L], https://www.caranddriver.com/reviews/a15099446/2017-chevrolet-bolt-ev-test-review/ (last visited Dec. 10, 2020).

without significant planning. For example, a driver wouldn't make "the 600-mile drive from Kansas City to Denver in a Chevrolet Bolt unless [they didn't] mind charging for upwards of 30 hours on 110-volt outlets along the way."[15] The inconvenience of charging combined with the slower charging time of the Bolt when compared to its direct competitors made every additional mile of the Bolt's range critically important to GM's marketing and to consumers.

28.    GM therefore emphasized the Bolt's purported range in its marketing. For example, GM's pressroom released this statement about the launch of the Chevy Bolt:

> Chevrolet promised to offer the first affordable electric vehicle with 200 miles or more of range and will exceed those expectations when the 2017 Bolt EV goes on sale later this year. With the vehicle's EPA-estimated range of 238 miles, owners can expect to go beyond their average daily driving needs — with plenty of range to spare — in the 2017 Bolt EV . . . .[16]

---

[15] *Id.*

[16] Liz Winter, *Bolt EV Offers 238 Miles of Range*, CHEVROLET: PRESSROOM (Sept. 13, 2016) [hereinafter Exhibit M], https://media.chevrolet.com/media/us/en/chevrolet/home.detail.html/content/Pages/news/us/en/2016/sep/0913-boltev.html (last visited Dec. 10, 2020).

GM further emphasized the range of the Bolt in a number of advertisements, like this ad from The Washington Post in June 2017, which prominently asks consumers to "begin a long-distance relationship, now"[17]:



[17] John Voelcker, *Yes, ads for the Chevy Bolt EV electric car do actually exist; here's one*, GREEN CAR REPORTS (June 19, 2017) [hereinafter Exhibit N], https://www.green carreports.com/news/1111082_yes-ads-for-the-chevy-bolt-ev-electric-car-do-actually-exist-heres-one (last visited Dec. 10, 2020).

29.   GM also displayed the range in this commercial from 2017[18]:



238 miles EPA-estimated range
per full charge

Your actual range may vary based on several factors including temperature, terrain, and driving technique.

30.   One of the Bolt's first three customers stated in a GM press release that it was "the range and technology" that attracted him to the Bolt.[19]

31.   For the 2018 and 2019 versions of the Bolt, GM continued to tout the Bolt's range prominently in advertisements.[20]

---

[18] *The All Electric Chevrolet Bolt EV - 238 Miles Per Full Charge | Chevrolet Bolt EV - Commercial TVC*, YOUTUBE (Jan. 11, 2017) [hereinafter Exhibit O], https://www.youtube.com/watch?v=uVIedKsm-Kg (last visited Dec. 10, 2020) (screen captured at 1:32).

[19] *Chevrolet Delivers First Bolt EVs to Customers*, CHEVROLET: PRESSROOM (Dec. 13, 2016) [hereinafter Exhibit P], https://media.chevrolet.com/media/us/en/chevrolet/home.detail.html/content/Pages/news/us/en/2016/dec/1213-boltev.html (last visited Dec. 10, 2020).

[20] *See, e.g.*, *2018 Chevrolet Bolt EV Specification*, CHEVROLET: PRESSROOM [hereinafter Exhibit Q], https://media.chevrolet.com/media/us/en/chevrolet/vehicles/bolt-ev/2018.tab1.html (last visited Dec. 10, 2020); *Chevrolet Bolt EV – 2019*, CHEVROLET: PRESSROOM [hereinafter Exhibit R], https://media.chevrolet.com/media/us/en/chevrolet/vehicles/bolt-ev/2019.tab1.html (last visited Dec. 10, 2020).

32.    Despite GM's representations, the most critical aspect of the Bolt's much-lauded range—the battery—could not be safely charged fully, and the represented range could not be achieved without dangerously overcharging the battery.

**B.    The Defective Battery Poses a Significant Safety Risk to Class Vehicle Owners and Lessees**

33.    Lithium ion batteries, such as the Defective Battery used in the Bolt, are used in most electric vehicles because of their "high power-to-weight ratio, high energy efficiency, good high-temperature performance, and low self-discharge."[21] However, these batteries also have a well-documented history of fire issues.[22]

**1.    The Bolt Lithium-Ion Battery**

34.    Like other batteries, lithium-ion batteries are made up of multiple power-generating compartments called "cells."[23] Each cell is made of three components: a

---

[21] *Batteries for Hybrid and Plug-In Electric Vehicles*, U.S. DEP'T OF ENERGY [hereinafter Exhibit S], https://afdc.energy.gov/vehicles/electric_batteries.html (last visited Dec. 10, 2020).

[22] *See* Adreesh Ghoshal, *How Lithium Ion Batteries in EVs Catch Fire*, MEDIUM (Aug. 16, 2020) [hereinafter Exhibit T], https://medium.com/the-innovation/how-lithium-ion-batteries-in-evs-catch-fire9d166c5b3af1#:~:text=Although%20rare%2C%20Lithium%2Dion%20batteries,overheats%2C%20resulting%20in%20a%20fire (last visited Dec. 10, 2020); *see also* Ryan Fogelman, *April 2020 Fire Report: How & Why Do Lithium-Ion Batteries Fail, Insight from the Jedi Master of Lithium Power!*, WASTE360 (May 5, 2020) [hereinafter Exhibit U], https://www.waste360.com/safety/april-2020-fire-report-how-why-do-lithium-ion-batteries-fail-insight-jedi-master-lithium (last visited Dec. 10, 2020).

[23] Chris Woodford, *Lithium-ion batteries*, EXPLAINTHATSTUFF! (Nov. 23, 2020) [hereinafter Exhibit V], https://www.explainthatstuff.com/how-lithium-ion-batteries-work.html (last visited Dec. 30, 2020).

positive electrode, a negative electrode, and an electrolyte.[24] Battery cells usually deliver either high levels or energy or power but cannot traditionally deliver both.[25]

35.    In order to develop a battery that would deliver the advertised range, Defendant developed a battery with "new cell design and chemistry."[26] The battery contains "nickel-rich lithium-ion chemistry" that purportedly provides "improved thermal performance over other chemistries" and requires a "smaller active cooling system for more efficient packaging."[27]

36.    The Bolt ostensibly uses "active thermal conditioning . . . to keep the battery operating at its optimum temperature, which results in solid battery life performance."[28]

---

[24] *Id.*

[25] *Drive Unit and Battery at the Heart of Chevrolet Bolt EV*, Chevrolet: Pressroom (Jan. 11, 2016) [hereinafter Exhibit W], https://media.gm.com/media/us/en/chevrolet/vehicles/bolt-ev/2021.detail.html/content/Pages/news/us/en/2016/Jan/naias/chevy/0111-bolt-du.html (last visited Jan. 4, 2021).

[26] *Id.*

[27] *Id.*

[28] *Id.*

37.     An image of the Bolt's battery pack is displayed below[29]:



38.     The Bolt's battery is structured with the cells[30] arranged "like books on a bookshelf, in groups."[31] Each group of pouch cells is "stacked to make modules," which are "held together at the ends by long bolts."[32] "The pack thermal management is

---

[29] Christopher Arcus, *Tesla Model 3 & Chevy Bolt Battery Packs Examined*, CLEANTECHNICA (Jan. 8, 2018) [hereinafter Exhibit X], https://cleantechnica.com/2018/07/08/tesla-model-3-chevy-bolt-battery-packs-examined/ (last visited Jan. 4, 2021). For a more in-depth explanation of the Bolt's battery, see WeberAuto, *Chevrolet Bolt EV Battery Disassemply*, YouTube (Feb. 19, 2018) [hereinafter Exhibit Y], https://www.youtube.com/watch?v=ssU2mjiNi_Q&feature=emb_title (last visited Feb. 11, 2021).

[30] The battery uses LG Chem pouch cells. For additional detail on pouch cells, see for example, *Pouch Cell – Small but not Trouble Free*, BATTERY UNIVERSITY [hereinafter Exhibit Z], https://batteryuniversity.com/learn/archive/pouch_cell_small_but_not_trouble_free (last visited Jan. 4, 2021).

[31] *See* Exhibit X.

[32] *Id.*

regulated by sensing temperature via thermistors located at the ends of the modules" and the liquid coolant is distributed via channels at the base of the cell packs.[33]

39.     GM repeatedly advertised this cell design and chemistry as delivering "a battery system with 160 kilowatts of peak power and 60 kilowatts hours of energy."[34] However, GM and its supplier, LG Chem, were unable to achieve this without dangerously overcharging the battery and posing risk to Class Members and other drivers.

### 2.     Chevy Bolts Have a Defective Lithium-Ion Battery

40.     After the release of the 2017 Bolt, drivers quickly began to experience issues with the Bolt's lithium-ion battery. Drivers experienced losses of propulsion power while driving the vehicles—including experiencing a sudden inability to accelerate the vehicle while driving.[35]

41.     Multiple drivers experienced sudden drops in battery levels and loss of power to their vehicles, some while driving in dangerous conditions.[36]

42.     GM addressed the loss of propulsion issue caused by the Defective Battery in a November 2017 customer satisfaction program bulletin:

> Certain 2017 model year Chevrolet Bolt EV vehicles may have a condition in which the calls within the battery pack have low voltage. This condition is related to the state of charge of the cell group. Eventually, the difference

---

[33] *Id.*
[34] *See* Exhibit W.
[35] *See, e.g.*, *infra* Section B.3.
[36] *See, e.g.*, *infra* Section B.3.

in the state of charge of the cell groups (average vs. minimum) may exceed a threshold.[37]

43.    GM's proposed solution was to replace the high voltage battery pack in affected vehicles.[38] However, it did not provide any notice to consumers that the Bolt's batteries were defective, nor did GM ever address the issues in the 2018 or 2019 Class Vehicles. GM did not address any possible widespread issue with the Defective Battery, and treated affected vehicles as individualized manufacturing errors or defects. However, there was a more insidious and widespread problem.

44.    In 2019, the issues with the lithium ion batteries began to escalate.[39] Class Members began to experience vehicle fires when charging their vehicles to a full or near-full charge.[40]

45.    On information and belief, the same issue that causes the low-voltage condition in certain cell groups can cause high-voltage conditions in certain cell groups in the Defective Battery. This issue can cause dangerous overheating of the battery while charging, resulting in fires in the Class Vehicles.

---

[37] GM Customer Satisfaction Program, 17297 High Voltage Battery Pack Low Cell (Nov. 2017) [hereinafter Exhibit AA], https://static.nhtsa.gov/odi/tsbs/2017/MC-10135136-9999.pdf (last visited Jan. 4, 2021).

[38] *Id.*

[39] *See* Exhibit A (stating that the first fire incident appears to have occurred on March 17, 2019).

[40] *See, e.g.*, *infra* Section B.3.

### 3.     GM Had Knowledge of the Defective Battery

46.     The NHTSA database contains all motor-vehicle consumer complaints submitted to the National Highway Traffic Safety Administration ("NHTSA") since January 2000. NHTSA maintains a database of motor-vehicle consumer complaints. GM, like other large automakers, regularly reviews these complaints and communicates directly with NHTSA. NHTSA has "[r]egular engagements with Original Equipment Manufacturers (OEMs), including weekly calls with large manufacturers" like GM.[41]

47.     Consumers are able to submit Vehicle Owner Questionnaires in which they provide information that includes the make, model, and model year of the vehicle, the approximate incident date, the mileage at which the incident occurred, whether the incident involved a crash or fire, whether any people were injured or killed, the speed of the vehicle at the time of the incident, and a description of the incident.

48.     A number of NHTSA complaints concerning the Defective Battery have been submitted to the database.

49.     These NHTSA complaints illustrate the significance of the notice of the Defective Battery that GM received from NHTSA and customers. Below are examples

---

[41] *Advancing Safety by Addressing Defects and Raising Awareness*, NHTSA [hereinafter Exhibit AB], https://www.nhtsa.gov/advancing-safety-addressing-defects-and-raising-awareness (last visited Dec. 10, 2020).

of consumer complaints submitted to NHTSA regarding loss of propulsion or dead

battery issues with the Class Vehicles[42]:

> NHTSA ID Number: 11031387
> NHTSA Posting Date: Sept. 16, 2017
>
> DRIVING ON THE FREEWAY (60-70MPH) WITH THE BATTERY AT
> OR SLIGHTLY ABOVE 50%, AN ALERT SOUNDED, AND THE
> BATTERY LEVEL IMMEDIATELY WENT DOWN TO NEARLY
> ZERO. IT ESTIMATED 10 MILES LEFT, BUT SPEED IMMEDIATELY
> DECREASED, AND THE ACCELERATOR STOPPED WORKING.
> AFTER RAPIDLY COASTING OVER TO THE SHOULDER, AND
> WITHIN SECONDS, THE CAR MADE A SERIES OF LOUD NOISES
> AND COMPLETELY STOPPED.
>
> NHTSA ID Number: 11062432
> NHTSA Posting Date: Jan. 4, 2018
>
> TL* THE CONTACT OWNS A 2017 CHEVROLET BOLT EV. WHILE
> DRIVING APPROXIMATELY 35 MPH, THE VEHICLE SHUT DOWN
> IN THE MIDDLE OF THE ROAD. THE "PROPULSION" WARNING
> INDICATOR ILLUMINATED. THE VEHICLE WAS TOWED TO
> CAPITOL CHEVROLET (905 CAPITOL EXPRESSWAY AUTO MALL,
> SAN JOSE, CA 95136) WHERE IT WAS DIAGNOSED THAT THE
> BATTERY NEEDED TO BE REPLACED. THE BATTERY WAS
> REPLACED. THE MANUFACTURER WAS MADE AWARE OF THE
> FAILURE AND REFERRED THE CONTACT BACK TO THE
> DEALER. THE FAILURE MILEAGE WAS 4,193.
>
> NHTSA ID Number: 11071886
> NHTSA Posting Date: Feb. 8, 2018
>
> THIS VEHICLE HAS ABRUPTLY GONE TO ZERO RANGE AND
> ENTERED A REDUCED POWER MODE EVEN THOUGH THE
> BATTERY SHOWED SUFFICENT RANGE SECONDS EARLIER.
> AFTER STOPPING, GETTING OUT AND KEYING UP AGAIN, THE

---

[42] NHTSA Complaint Database for 2017 Chevrolet Bolt, (last visited Dec. 10, 2020);
NHTSA Complaint Database for 2018 Chevrolet Bolt, (last visited Dec. 10, 2020);
NHTSA Complaint Database for 2019 Chevrolet Bolt, (last visited Dec. 10, 2020).

CAR STAYED AT ZERO RANGE AND DISPLAYED A CHARGE NOW MESSAGE.

THE FIRST INCIDENT HAPPENED ON JANUARY 11, 2018. IN THAT CASE THE RANGE METER SHOWED ABOUT 30 MILES REMAINING. AS I UNDERSTAND IT, THERE ARE TWO PRELINIARY WARNINGS BEFORE THE THIRD MORE INSISTENT ONE. THE CAR WAS DRIVEN BY ANOTHER COLLEAGUE WHO HADN'T DRIVEN IT BEFORE, AND HE WASN'T SURE IF HE MISSED THE FIRST TWO WARNINGS OR NOT. HE WAS TRAVELING AT 70 MPH ON THE FREEWAY AT THE TIME THE VEHICLE "STALLED" FOR LACK OF A BETTER WORD. THE RANGE WENT TO NOTHING, THE VEHICLE DROPPED IN SPEED SIGNIFICANTLY (NOT A PURE STALL) AND HE HAD TO MOVE THROUGH LANES TO THE SIDE OF THE ROAD AMID FASTER TRAFFIC. BECAUSE OF THE UNCERTAINTY ABOUT WARNINGS HE MAY HAVE MISSED (I DON'T THINK THEY'RE SUBTLE ENOUGH TO MISS, SO IT IS MY VIEW THEY NEVER HAPPENED) WE TALKED OURSELVES OUT OF A DEALER VISIT. WE TOWED IT TO A NEARBY LEVEL 3 FAST CHARGER INSTEAD, AFTER WHICH IT PERFORMED NORMALLY.

SUBSEQUENT ONSTAR E-MAIL HEALTH REPORTS HAVE DESCRIBED THE BATTERY AS IN GOOD CONDITION. THE MOST RECENT OF THESE WAS FEBRUARY 7TH, WHICH IS INTERESTING BECAUSE ...

THEN, ON FEBRUARY 8, 2018, IT HAPPENED AGAIN. THIS TIME THE VEHICLE WENT FROM 60 MILES TO NOTHING. SAME ISSUE: DRASTICALLY REDUCED POWER WITH NO ADVANCED WARNING, MANEUVERING THROUGH FASTER TRAFFIC TO A FREEWAY EXIT RAMP. THE CAR CAME TO A HALT ON THE LONG EXIT RAMP. IT WAS TOWED TO A DEALER, WHERE IT NOW SITS.

I HAVE NEVER RECEIVED A SERIVICE BULLETIN OR RECALL NOTICE FOR ANYTHING, AND AS FAR AS I KNOW THE CAR IS UP TO DATE IN THIS REGARD.

THERE MAY BE TWO PROBLEMS: 1) THE BATTERY HAS A DEFECT AND 2) ON STAR HEALTH BATTERY CHECKS REPORTS ARE MEANINGLESS.

NHTSA ID Number: 11091674
NHTSA Posting Date: Apr. 26, 2018

DESPITE HAVING A FULLY CHARGED BATTERY, WHEN WE
PARKED OUR VEHICLE, IT WOULD NOT START. THE ENTIRE
ELECTRICAL SYSTEM WAS DOWN. WE JUMPED THE STARTER
BATTERY AND THAT PROVIDED ENOUGH POWER TO ALLOW
US TO SHIFT INTO NEUTRAL SO THAT WE COULD HAVE THE
CAR TOWED. AFTER A WEEK, AND MULTIPLE CALLS TO THE
ENGINEERS IN DETROIT, THE DEALER HAS STILL NOT BEEN
ABLE TO DETERMINE THE PROBLEM.MY CONCERN IS THAT
THEY ARE ATTEMPTING TO REPAIR AN ISSUE WITHOUT
HAVING A FULL UNDERSTANDING OF THE PROBLEM. IF THIS
ISSUE WERE TO RE-OCCUR WHILE DRIVING AT HIGH SPEED,
THE CONSEQUENCES COULD BE CATASTROPHIC, AS THE CAR
WOULD IMMEDIATELY COME TO A STOP AND ALL CONTROL
MIGHT BE LOST. I DON'T GET THE SENSE THAT GM IS TAKING
THIS ISSUE SERIOUSLY ENOUGH. THEY SEEM TO BE TREATING
THIS LIKE A TECH COMPANY DEALS WITH SOFTWARE ISSUES.
THEY ARE SIMPLY WAITING FOR THE PROBLEMS TO OCCUR
AND THEN HAVING THEIR ENGINEERS RUN DIAGNOSTICS.
UNFORTUNATELY, GIVEN THE SEVERITY OF THE ISSUE, THEY
MAY BE PUTTING LIVES AT STAKE WHILE THEY "DE-BUG"
THEIR DESIGN. THIS IS NOT A COMPUTER APP. IT IS A VEHICLE
CARRYING HUMANS AT HIGH SPEED. GM NEEDS TO BE MORE
PROACTIVE AND TAKE THESE CARS OFF THE ROAD UNTIL
THEY FULLY UNDERSTAND THE ISSUE AND HAVE A
PERMANENT RESOLUTION.

NHTSA ID Number: 11113064
NHTSA Posting Date: July 20, 2018

THE BOLT STOPPED PROVIDING POWER WHEN I WAS DRIVING
DOWN A 4 LANE FREEWAY. IT HAS ALREADY FAILED 3 TIMES
IN THE PAST, THIS IS THE 4TH TIME.

NHTSA ID Number: 11114062
NHTSA Posting Date: July 26, 2018

ON 2018-07-26 AT APPROXIMATELY 2325H, VEHICLE WAS BEING
DRIVEN AT ~70MPH NORTHBOUND ON I-95, THE MAINE

TURNPIKE. LOCATION WAS APPROXIMATELY 1/2 MILE NORTH OF EXIT-32 (BIDDEFORD, ME). ROAD CONDITIONS WERE GOOD, TEMPERATURES IN THE MID-70F, HUMID. THE OWNER'S WIFE WAS DRIVING, WITH HER HUSBAND IN THE PASSENGER SEAT.

AT THE TIME LISTED, THE VEHICLE SOUNDED A WARNING CHIME, AND RAPIDLY LOST POWER FROM HIGHWAY SPEEDS (70 MI/HR). VEHICLE, WITH THE EXCEPTION OF SPEED, WAS IN CONTROL WITH BRAKES AND STEERING, EMERGENCY FLASHERS, AND LIGHTS OPERATING.

. . . .

NHTSA ID Number: 11115206
NHTSA Posting Date: July 27, 2018

BOLT EV CHIMED, ICON APPEARED AND THE TRAVEL MILEAGE FROM THE EVENING'S CHARGE DROPPED FROM ABOUT 240 MI TO LO AND I HAD TO PULL OVER AND PARK. MESSAGE ON DISPLAY WAS PROPULSION POWER IS REDUCED. I THEN HAD TO BE TOWED TO CHEVY DEALER TO HAVE THE RECALL #18097 REPROGRAMMED. PROBLEM REOCCURRED 3 DAYS LATER. HAD TO BE TOWED AGAIN. CAR IS UNSAFE. I LIVE IN VERY RURAL AREA...WAS LUCKY IT WAS DAYLIGHT.

NHTSA ID Number: 1115887
NHTSA Posting Date: Aug. 3, 2018

CAR SUDDENLY LOST POWER ON THE HIGHWAY. I HAD TO COAST TO A STOP.

THE HIGH-VOLTAGE BATTERY WHICH HAD BEEN 3/4 FULL WENT DOWN TO ZERO.

AFTER THE INCIDENT, THE CAR COULD NO LONGER BE DRIVE.

I'D ALREADY HAD GM'S RECALL INSTALLED N172127150

NHTSA ID Number: 11127952
NHTSA Posting Date: Sept. 2, 2018

DRIVING AT 65 MPH WITH 100+ MILE RANGE, CAR HAD A SUDDEN AND COMPLETE LACK OF PROPULSION. ELECTRONICS

IN THE CAR CONTINUED TO WORK, BUT ABSOLUTELY NO
PROPULSION. COULD SHIFT CAR TO NEUTRAL. CAR
EVENTUALLY TOWED TO DEALER.

NHTSA ID Number: 11165022
NHTSA Posting Date: Dec. 13, 2018

CHEVROLET BOLT 2017 WITH ABOUT 55% OF BATTERY
CHARGE BRIEFLY DISPLAYED A MESSAGE 'PROPULSION MAY
BE REDUCED' AND A FEW MINUTES LATER IT STOPPED IN THE
MIDDLE OF THE FREEWAY AND HAD TO BE TOWED AWAY. THE
BATTERY INDICATOR SWITCHED MOMENTARILY FROM 125
MILES TO 40 MILES AND THEN IMMEDIATELY TO 10 MILES AND
THE CAR COULD NOT BE SHIFTED TO DRIVE, DISPLAYING
MESSAGE 'CONDITION NOT CORRECT TO SHIFT.' BEWARE, AS
GLITCH LIKE THAT WITH BOLT CAN REALLY ENDANGER YOUR
LIFE, AS IT ENDANGERED MINE. I WAS FORTUNATE TO BE
ALONE IN THE CAR WITHOUT MY FAMILY, STUCK ON THE
FREEWAY AFTER DARK AS CARS AROUND WERE GOING FULL
SPEED. THE DEALERSHIP REPLACED THE BATTERY, BUT AFTER
THE REPLACEMENT THE CAPACITY AT FULL CHARGE SHOWS
ONLY 154 MILES IN LIEU OF OVER 220 MILES BOLT SUPPOSED
TO HAVE.

NHTSA ID Number: 11204280
NHTSA Posting Date: Apr. 9, 2019

THE BATTERY FOR 2017 CHEVY BOLT HAS PROBLEM AND MY
CAR STOPPED IN THE MIDDLE OF THE ROAD. I WAS VERY
LUCKY THAT I WAS IN THE CITY AND THIS HAPPENED AT A
TRAFFIC LIGHT. THE BATTERY WAS SHOWING IT HAS 70 MILES
LEFT, IT DROPPED TO 30 AND THEN ZERO RIGHT AWAY AND I
COULD NOT MOVE THE CAR AND HAD TO TOW THE CAR TO
DEALERSHIP. I HAVE ONLY 17,000 MILES ON THE CAR. I TOOK
THE CAR TO DEALERSHIP, AT FIRST THEY TOLD ME THAT
THERE IS A RECALL ON BATTERY THAT WAS ISSUED APRIL 1ST
AND I SHOULD BE GETTING A LETTER IN THE MAIL, LATER
CHEVY CUSTOMER SERVICE AND DEALERSHIP CHANGED
THEIR STORY AND NOW THEY ARE TELLING ME THERE IS NO
RECALL AND IT IS ONLY FOR CUSTOMER SATISFACTION THAT
THEY NEED TO REPLACE THE BATTERY! I DO NOT WANT TO

IMAGINE IF THE CAR WOULD HAVE STOPPED IN THE MIDDLE OF THE HIGHWAY. IF YOU OWN A CHEVY BOLT BE VERY CAREFUL AND I WOULD NOT TRUST THE SAFETY OF THE VEHICLE AS CHEVY IS NOT EVEN ISSUING A RECALL TO FIX THIS PROBLEM.

NHTSA ID Number: 11204814
NHTSA Posting Date: Mar. 2, 2019

ON THE NIGHT OF MARCH 2, 2019 I WAS DRIVING AT ABOUT 50 MPH ON A STATE HIGHWAY WHEN I SUDDENLY, WITHOUT WARNING, LOST PROPULSION. A NOTE CAME ON ON THE DASH INDICATING THAT I NEEDED TO PULL OVER AND PUT THE CAR INTO PARK. HAPPILY THERE WAS NO TRAFFIC SO THAT I WAS ABLE TO DO SO WITHOUT AN ACCIDENT. I WAS UNABLE TO RESTART THE CAR AND PUT IT INTO DRIVE AFTER THAT, SO I CALLED A TOW TRUCK. IT WAS VERY COLD WAITING FOR THE TOW TRUCK AS THE CAR HAD NO HEAT. THE CAR REPORTED APPROXIMATELY 50% BATTERY CAPACITY THE ENTIRE TIME. A SUDDEN UNEXPECTED LOSS OF PROPULSION IS A DANGEROUS EVENT. THE CAR HAD ONLY 11,000 MILES ON IT. AFTER SITTING FOR SOME TIME, THE CAR HAS 'FIXED' ITSELF. HOWEVER, THIS WILL PROBABLY HAPPEN AGAIN. I HAVE BROUGHT IT TO A CERTIFIED CHEVROLET SERVICE CENTER AND CALLED CHEVROLET TO REPORT THE ISSUE. BECAUSE THE PROBLEM IS INTERMITTENT, THEY ARE UNABLE TO DIAGNOSE THE PROBLEM.

NHTSA ID Number: 11243074
NHTSA Posting Date: Aug. 8, 2019

MY 2017 CHEVY BOLT LOST PROPULSION WHILE IN MOTION ON CITY STREETS IN LOS ANGELES IN TRAFFIC WITHOUT WARNING FROM EITHER ON STAR OR THE VEHICLE. THE BATTERY INDICATED APPROXIMATELY AN 60% CHARGE.

NHTSA ID Number: 11218778
NHTSA Posting Date: June 9, 2019

ON SATURDAY JUNE 1, 2019 I WAS DRIVING DOWN THE FREEWAY AT APPROXIMATELY 65MPH. AS I PULLED OFF THE

FREEWAY ONTO A SIDE ROAD, THE "LOW PROPULSION" LIGHT CAME ON. I IMMEDIATELY LOST ALL PROPULSION AND COASTED INTO A PARKING LOT. I HAD THE CAR TOWED TO THE CHEVY DEALER. THE TECHNICIAN WAS ABLE TO START THE CAR ON MONDAY BUT AS HE DROVE IT INTO THE GARAGE, THE SAME THING HAPPENED, SUDDEN LOSS OF COMPULSION. THE DEALER DIAGNOSED MY CAR WITH CHEVROLET ENGINEERING AND HAD TO ORDER A TRANSMISSION, POWER HARNESS AND A 3RD MAJOR PART. THE SERVICE PERSON SAID THIS HAD HAPPENED TO SEVERAL OTHER 2019 BOLTS. THIS SUDDEN LOSS OF PROPULSION WAS A DANGEROUS SITUATION AND COULD HAVE BEEN MUCH WORSE HAD WE LOST PROPULSION ON THE FREEWAY, JUST 5 MINUTES BEFORE WE EXITED THE FREEWAY.

NHTSA ID Number: 11268291
NHTSA Posting Date: Sept. 19, 2019

VEHICLE WAS DOING HIGHWAY SPEEDS ON INTERSTATE 81 IN PENNSYLVANIA IN THE LEFT LANE. SUDDENLY, THE VEHICLE MADE A LOUD THUD, FOLLOWED BY RAPID DECELERATION. MANAGED TO BARELY MAKE IT TO THE RIGHT SHOULDER, AND AT THAT POINT THE VEHICLE PUT ITSELF INTO PARK AND REFUSED TO SHIFT INTO DRIVE OR REVERSE. WARNING MESSAGES AND INDICATORS LIT UP ON THE DASHBOARD, AND AN ONSTAR NOTIFICATION EMAIL WAS RECEIVED ON MY PHONE. WAS FORTUNATE TO MAKE IT TO THE SHOULDER, OTHERWISE THE VEHICLE WOULD HAVE BEEN STRANDED IN THE MIDDLE OF THE HIGHWAY WITH NO WAY TO MOVE IT OFF THE ACTIVE ROADWAY.

NHTSA ID Number: 11329136
NHTSA Posting Date: June 15, 2020

VEHICLE UNEXPECTEDLY & WITHOUT WARNING LOST POWER WHILE TRAVELING ON HIGHWAY. VEHICLE WAS UNABLE TO ACCELERATE AND ALL POWER FROM THE HIGH VOLTAGE SYSTEM WAS LOST.

NHTSA ID Number: 11363890
NHTSA Posting Date: Oct. 8, 2020

I WAS DRIVING MY CHEVY BOLT AT APPROXIMATELY 40-45
MPH WHEN IT WAS AT ABOUT 50% CHARGE CAPACITY WHEN
ALL OF A SUDDEN THE CAR SHARPLY DECELERATED AND
WARNING LIGHTS CAME ON SAYING THE CHARGE WAS DOWN
TO 0 AND THAT IT NEEDED TO BE RECHARGED IMMEDIATELY.
I PULLED OVER TO THE SIDE OF THE ROAD AND CALLED FOR
HELP. THERE'S NO WAY THE CAR SHOULD HAVE LOST 50% OF
IT'S CHARGE OUT OF NOWHERE LIKE THAT. I WAS NOT ABLE
TO RESTART THE CAR OR REGAIN POWER. IT HAS TO BE
TOWED TO THE DEALER.

50.     Below are examples of consumer complaints submitted to NHTSA

regarding fires from the Class Vehicles. Each of these complaints cites fire or smoke

coming from the Class Vehicles while they are being charged[43]:

NHTSA ID Number: 11365622
NHTSA Posting Date: Oct. 21, 2020

I BROUGHT THE CAR TO THE DEALER ON 2 SEPARATE
OCCASIONS WITH CONCERNS OF A FAULTY BATTERY. THE
BATTERY SUDDENLY STOPPED CHARGING FULLY. HOWEVER, I
WAS TOLD BY THE DEALER TWICE THAT THE BATTERY WAS
FUNCTIONING PROPERLY AND THERE WAS NOTHING THEY
COULD DO. I OPENED A CLAIM WITH GM REGARDING THIS
INCIDENT, ASKING THEM TO REPLACE THE BATTERY, SINCE IT
WAS STILL UNDER WARRANTY, AND THERE WAS CLEARLY AN
ISSUE. AFTER MONTHS OF BACK-AND-FORTH, GM CLOSED MY
CASE STATING IT WAS NORMAL DEPRECIATION OF THE
BATTERY. ONE WEEK AFTER THEY CLOSED MY CASE, **THE
BATTERY SPONTANEOUSLY CAUGHT FIRE WHILE
CHARGING IN MY GARAGE OVERNIGHT**. IT TOTALED 2
VEHICLES, CHARRED EVERYTHING IN MY GARAGE, AND
CAUSED SUCH SEVERE SMOKE DAMAGE THAT ALMOST
EVERYTHING IN MY HOME WAS A TOTAL LOSS. THE FIRE
DEPARTMENT DETERMINED THE FIRE ORIGINATED FROM THE

[43] NHTSA Complaint Database for 2017 Chevrolet Bolt, (last visited Dec. 10, 2020);
NHTSA Complaint Database for 2018 Chevrolet Bolt, (last visited Dec. 10, 2020);
NHTSA Complaint Database for 2019 Chevrolet Bolt, (last visited Dec. 10, 2020).

TRUNK AREA, WHERE THE BATTERY IS. MY FAMILY IS DISPLACED WHILE REPAIRS ARE BEING DONE TO MY HOME, AT A TUNE OF APPROXIMATELY $200,000 AT THIS POINT. WE LOST APPROXIMATELY $105,000 IN CONTENTS, AS WELL AS THE 2 TOTALED VEHICLES ($75,000).

NHTSA ID Number: 11372429
NHTSA Posting Date: Oct. 30, 2020

IN THE EARLY MORNING HOURS OF OCTOBER 21ST, AROUND 3AM, **WE WERE WOKEN UP BY SMOKE/FIRE ALARMS**. WE STARTED RUNNING AROUND OUR HOME TO IDENTIFY THE CAUSE OF THE ALARM. AFTER ABOUT 5 MINUTES OF SEARCHING INSIDE THE HOME AND FINDING NOTHING, WE REALIZED THAT THERE WAS SOME SMELL OF SMOKE COMING FROM THE GARAGE AND WHEN THE MUDROOM DOOR WHICH LEADS TO THE GARAGE WAS OPENED, WE FOUND THAT **THE CHEVY BOLT WAS ON FIRE AND THERE WAS LOT OF SMOKE IN THE GARAGE.** THE CHEVY BOLT WAS PARKED/STATIONARY IN DOOR 3 SECTION OF THE GARAGE AND OUR OTHER CAR WAS PARKED IN DOOR 1 SECTION OF THE GARAGE. THE DOOR 2 SECTION OF THE GARAGE WAS EMPTY AT THE TIME OF THE INCIDENT. WITH CHEVY BOLT ON FIRE, WE SAW THAT THE DOOR 3 SECTION OF THE GARAGE WAS ENGULFED IN FLAMES AND FILLED WITH SMOKE. WE TRIED TO USE THE FIRE EXTINGUISHER TO PUT-OFF THE FIRE BUT COULD NOT CONTAIN THE SPREAD OF THE FIRE. THE CHEVY BOLT WAS KEPT FOR CHARGING OVERNIGHT, AS HAS BEEN THE GENERAL PRACTICE THAT WE HAVE BEEN FOLLOWING FOR AROUND 2 YEARS. WE CALLED 911 AS SOON AS WE SAW THE GARAGE IN FLAMES AND FIRE ENGINES ARRIVED WITHIN 15 MINUTES BUT THE FIRE HAD SPREAD WIDELY AND CAUSED RAMPANT DAMAGES TO THE ENTIRE GARAGE INCLUDING THE OTHER CAR, BEDROOM ON THE TOP OF THE GARAGE IN THE SECOND FLOOR AND THE BEDROOM ADJOINING THE GARAGE IN THE FIRST FLOOR. WHILE ALL THE OCCUPANTS OF THE HOME GOT OUT WITHIN AROUND 8 MINUTES OF HEARING THE FIRE ALARM, THE FIRE AND HEAT/SMOKE SPREAD QUICKLY TO WASHER/DRYER SECTION, EAT IN DINING, KITCHEN, FAMILY ROOM AND FORMAL DINING ROOM. THE OTHER SECTIONS OF THE HOME INCLUDING THE

FOYER, OFFICE ROOM, SUN ROOM AND ALL OF THE
BEDROOMS UPSTAIRS WERE QUICKLY FILLED BY SMOKE AND
SOOT. THE HEAT INSIDE THE HOME WAS SO MUCH THAT ONE
CAN LITERALLY SEE THE FRAMING STUDS. THE TOWNSHIP
FIRE AND POLICE DEPARTMENT ARRIVED PROMPTLY ON THE
SCENE AND HAVE BEEN DILIGENTLY FOLLOWING UP ON THE
INVESTIGATION.

NHTSA ID Number: 11364692
NHTSA Posting Date: Oct. 16, 2020

CHEVY BOLT FINISHED CHANGING AND THEN STARTED TO
SMOKE FROM UNDER THE CAR. THE SOUND OF POPPING
NOISES WERE HEARD AND THEN **10 MINUTES LATER THE CAR
WAS ENGULFED IN FLAMES**. THE CARS BATTERY PACK
STARTING POPPING THEN EXPLODED IN FLAMES.

NHTSA ID Number: 11374956
NHTSA Posting Date: Nov. 17, 2020

2017 BOLT EV WAS PARKED NOSE INTO GARAGE PLUGGED
INTO WALL CHARGER CHARGING UNATTENDED WITH MY
PHONE SET TO ALERT ME WHEN ESTIMATED TO BE FULLY
CHARGED. WHEN I CAME OUT OF THE HOUSE TO UNPLUG
CHARGER THERE WAS FIRE VISIBLE UNDER BACK SEAT IN
PASSENGER COMPARTMENT OF VEHICLE. CALLED 911 AND BY
THE TIME POLICE AND FIRE RESPONDED WITHIN A FEW
MINUTES **ENTIRE BATTERY UNDER VEHICLE ENGULFED
CAR IN FLAMES** CAUSING GARAGE FIRE WHICH DESTROYED
GARAGE AND ALL IT CONTENTS.JUST LEARNED FROM CARFAX
THAT GM ISSUED RECALL NOVEMBER 15 FOR POTENTIAL
BATTERY FIRES WHEN AT OR NEAR FULL CHARGE.

NHTSA ID Number: 11339878
NHTSA Posting Date: July 17, 2020

MY 2019 CHEVY BOLT WAS FULLY CHARGED AND DRIVEN FOR
12 MILES TO OUR DESTINATION, A TOWNHOUSE
DEVELOPMENT WITH PRIVATE OUTDOOR OPEN PARKING. WE

ARRIVED AROUND 7:30PM, PARKED IT AND TURNED IT OFF. 20 MINS LATER A NEIGHBOR RANG OUR DOORBELL BECAUSE THERE WAS 20 FOOT HIGH HEAVY WHITE/GRAY SMOKE CLOUD COMING OUT THE BACK OF THE CAR. I CALLED 911 AND FIREFIGHTERS DOUSED THE CAR WITH WATER FOR AN HOUR AFTER SMASHING THE REAR WINDOW TO GET ACCESS TO THE SMOKING AREA.THEY LEFT, LESS THAN AN HOUR LATER I CALLED 911 AGAIN B/C THE SMOKE RESTARTED. SMOLDERING WAS SO HOT IT PARTLY BURNED THE BACKSEAT. ONCE THE CAR WAS COOL ENOUGH IT WAS TOWED TO THE DEALERSHIP WHERE IT WAS ORIGINALLY PURCHASED. THERE IT BEGAN TO SMOKE AGAIN. 911 WAS CALLED AND FIREFIGHTERS PUT OUT THE SMOKE ONCE AGAIN. THIS TIME THE SMOKE WAS SMALL AND STARTED ON THE AREA WHERE THE BACKSEAT WAS PREVIOUSLY LOCATED; MINUTES LATER THE SAME HEAVY SMOKE CAME OUT FAST FROM UNDERNEATH THE FRONT PASSENGER SIDE. THE POLICE WERE THERE TO WITNESS THAT INCIDENT. IT WAS AROUND MIDNIGHT THEN.

**3 SPONTANEOUS COMBUSTIONS IN 4 HOURS**; DOOR CAMERA VIDEOS DIDN'T PICK UP MOVEMENT BETWEEN OUR ARRIVAL AND THE NEIGHBOR RINGING THE BELL; ONSTAR REPORTS DON'T SHOW ANYTHING ELECTRICALLY WRONG WITH THE CAR; NO ALTERATIONS HAD BEEN MADE TO IT; AND THE DASHBOARD DIDN'T SHOW ANY WARNINGS DURING THAT ONE LAST TRIP. BASED ON THE ABOVE, I BELIEVE THE PROBLEM WAS A HIGH VOLTAGE BATTERY RUNAWAY THERMAL EVENT.

EVEN THOUGH THE CAR IS STILL UNDER GM'S WARRANTY, THEY REFUSE TO INVESTIGATE BECAUSE WE CALLED OUR INSURANCE FIRST INSTEAD OF GM (PER GM'S PRODUCT ASSISTANCE CLAIM TEAM). THE CAR IS CURRENTLY AT AIIA AND GM COULD GO INVESTIGATE. BUT THEY WON'T. HOW MANY OTHER BOLTS ARE SPONTANEOUSLY COMBUSTING AND PEOPLE GETTING HURT? **HOW MANY WILL IT TAKE FOR GM TO CARE?**

51.     The first complaint of spontaneous fire from the Class Vehicles was

submitted to NHTSA on July 8, 2019:

NHTSA ID Number: 11230072
NHTSA Posting Date: July 8, 2019

ON MARCH 17, 2019 AT APPROXIMATELY 3:45P.M., WE PARKED
THE BOLT IN THE DRIVEWAY OF OUR HOME. WE EXITED THE
BOLT AND PLUGGED IT INTO OUR JUICEBOX (LEVEL 2)
CHARGER AS USUAL. AT APPROXIMATELY 5:00 PM, WE WERE
ALERTED THAT THE BOLT WAS ON FIRE. WE DISCOVERED
SMOKE BILLOWING OUT OF THE REAR OF THE BOLT AND THE
BOLT APPARENTLY COMBUSTING FROM WITHIN IN THE AREA
OF THE BATTERY CELLS. THE FIRE DEPARTMENT WAS
CONTACTED AND TOOK APPROXIMATELY 3 HOURS TO
CONTROL THE FIRE AND SMOKE. THE FIRE DEPARTMENT
EVACUATED US, OUR DOWNSTAIRS NEIGHBORS, AND BOTH
UNITS OF THE HOME NEXT DOOR DURING THE FIRE. THE
FUMES FROM THE BURNING MATERIALS WAS SO THICK AND
NOXIOUS IT PERMEATED OUR HOME, REQUIRING
PROFESSIONAL CLEANING. WE EXPERIENCED HEADACHES
FOLLOWING CONTACT WITH THE SMOKE. THE BOLT IS A
TOTAL LOSS. IT TOOK CHEVY A FEW DAYS TO RESPOND TO
OUR CLAIM. EVENTUALLY CHEVY SENT TWO ENGINEERS
FROM DETROIT TO OUR DRIVEWAY TO INSPECT THE JUICE
BOX. **CHEVY PURCHASED THE CAR FROM THE INSURANCE
COMPANY**.

52.     GM was also on notice of the serious problems with the Defective Battery

because consumers presented vehicles (or records of destroyed vehicles) for warranty

claims through GM authorized dealers. GM reviews this information and makes

warranty determinations.

53.     Despite evidence of fires resulting from charging the Bolt's batteries to

100%—and despite GM's apparent purchase of an affected vehicle for investigative

purposes and knowledge of the fires—a GM engineer gave an interview just months

after the first NHTSA complaints, saying that "[w]e engineered the battery system so

that you can charge to 100% and maximize range. If you want maximum range, charge to 100%."[44]

54.    As the numerous NHTSA complaints show, this is untrue. The Defective Battery is at risk of catching fire at full or near-full charge unless the Class Vehicles are modified to deplete the battery capacity by 10%, reducing the vehicle range well below the advertised 238-mile range that consumers were promised when they purchased or leased the Class Vehicles.

## C.    The Proposed Recall is Insufficient to Remedy the Harm to Class Vehicle Owners and Lessees

55.    On November 13, 2020, more than a year after the first known incident of fire in the Class Vehicles, and more than four years after GM began manufacturing and distributing Class Vehicles, GM announced its intent to recall over 50,000 vehicles with high voltage batteries that "may pose a risk of fire when charged to full, or very close to full, capacity."[45] Instead of completely recalling the Class Vehicles to replace the dangerous batteries, or buying them back to prevent future incidents, GM's recall proposes an "interim remedy" for Class Vehicles that will limit the battery capacity of the Vehicles to 90% by reprogramming the hybrid propulsion control module.[46]

---

[44] Steve Birkett, *3 Takeaways from GM's Q&A with a Chevy Bolt EV Battery Expert*, TORQUENEWS (Oct. 31, 2019) [hereinafter Exhibit AC], https://www.torquenews.com/7893/3-takeaways-qa-chevy-bolt-ev-battery-expert (last visited Dec. 10, 2020).
[45] Exhibit A.
[46] Exhibit A.

56.    GM notified consumers that dealerships would offer a software update to implement the interim remedy on November 17, 2020, and also instructed consumers how to reduce the vehicle change settings themselves in order to limit the charging capacity.[47] GM also instructed consumers not to park their vehicles in their garages or carports until after they had implemented the software changes:

> We will be providing our dealers with a software update beginning November 17, 2020 that will limit the charge for all the vehicles in this population to 90% while we continue to investigate the cause of these incidents. In the meantime, we know that the safety of our owners and their families is paramount, which is why we're asking owners to take the following steps now that will limit the charge capacity to 90% and reduce the risk of fire.
>
> **For your 2017 model-year Bolt EV:**
>
> • Change the vehicle charge settings to use the Hill Top Reserve option
>
> For instructions on how to activate these settings, please view the video at our website:
> Chevy.com/boltevrecall ›
>
> If you are unable to successfully make these changes, or do not feel comfortable making these changes, we ask you to not park your car in your garage or carport until after you have visited your dealer.

57.    This "fix" leaves consumers with a vehicle with considerably less range than advertised—an issue that Class Vehicle owners and lessees quickly raised via NHTSA complaints. Several examples of such complaints are below[48]:

---

[47] *See* Email from Steve Hill, U.S. Vice President, Chevrolet, to 2017 Bolt Owners (2020) [hereinafter Exhibit AD], https://static.nhtsa.gov/odi/rcl/2020/RMISC-20V701-4450.pdf (last visited Dec. 10, 2020).

[48] NHTSA Complaint Database for 2017 Chevrolet Bolt (last visited Dec. 10, 2020).

NHTSA ID Number: 11376229
NHTSA Posting Date: Nov. 25, 2020

TODAY I RECEIVED RECALL NOTIFICATION GM N202311730
ABOUT DEFECTIVE BATTERIES THAT CAN CAUSE A FIRE WHEN
CHARGED TO 100%. GM'S SOLUTION IS TO CHANGE SOFTWARE
TO LIMIT MY VEHICLE'S CHARGE TO 90%. THIS IS NOT A
SOLUTION. IT IS A BAND AID. THE BATTERIES ARE DEFECTIVE
AND SHOULD BE REPLACED. WHY SHOULD I SUFFER THE
CONSEQUENCE OF THIS AND HAVE TO DEAL WITH REDUCED
VEHICLE RANGE AND MORE FREQUENT CHARGING. IF THE
BATTERIES ARE A FIRE HAZARD, THEY SHOULD BE REPLACED
WITH SAFE BATTERIES AT NO-COST TO THE OWNER.

NHTSA ID Number: 11376136
NHTSA Posting Date: Nov. 24, 2020

GM RECALL DUE TO BATTERY FIRES AFFECTS THIS CAR. THE
RECALL SOLUTION TO SIMPLY LIMIT MY DRIVING TO 90% OF
THE RANGE IS ABHORRENT. MY CAR IS NOW LESS THAN 90%
EFFECTIVE--THERE ARE DESTINATIONS I CAN NO LONGER
REACH IN A SINGLE CHARGE, AND RECHARGING IS NOWHERE
NEAR AS FAST OR UBIQUITOUS AS GAS. GM NEEDS A
SOLUTION THAT RESTORES THE FULL DISTANCE ABILITY OF
THIS CAR, OTHERWISE IT'S OUTRIGHT FRAUD.

58.     GM has been aware of the Defective Battery in the Class Vehicles since at

least July 2019, when it received the first complaint of a spontaneous fire when charging

a Chevy Bolt and when GM purchased the vehicle at issue, purportedly to determine the

cause of the fire. But GM knew or should have known of the risk long before that—

before putting the Class Vehicles on sale in the first place. For more than a year after the

first fire, GM operated with a cynical "business-as-usual" attitude, going so far as to

reiterate to Class Members that they could and should charge their Vehicles to 100%,[49]

---

[49] Exhibit AC.

before opening a formal investigation into the fires in August 2020.[50] After opening this investigation, it took months for GM to communicate to Plaintiff and Class Members that the danger from the Class Vehicles was so high that the Vehicles should be parked outside.

59.     There is no justifiable reason for this delay, particularly since GM has still done little more than warn consumers not to park their vehicles inside their garage lest the Defective Battery burn their home down. There is a possible financial motive, though: the delay allowed GM to continue selling its remaining inventory of Class Vehicles before switching over to a new battery design in advance of the 2020 model year.

60.     Despite knowledge of the fires dating back to the summer of 2019 at the latest, GM has sold and leased, and continues to sell and lease, Class Vehicles with the knowledge that they contain defective and dangerous batteries that pose a risk to consumers. Instead, GM proposes a "fix" that results in reduced vehicle range and the need for more frequent charging by Class Vehicle owners and lessees.

61.     More frequent charging is a significant issue for owners of EVs like the Bolt, because charging an EV battery takes much longer than simply refilling the fuel tank in an internal-combustion vehicle. This is why range is such a significant point of emphasis in EV advertising and such an important part of the bargain consumers strike when they choose to buy one EV over another.

---

[50] Exhibit A.

62.     Had GM disclosed the defect to Class Members, reasonable consumers would have been aware of it. Instead, Defendant remained silent until more than a year after the first incident of a Bolt catching fire while charging.

63.     GM's knowledge of the Battery Defect, and its subsequent inaction, has resulted in harm to Plaintiff and Class Members.

## V.    CLASS ACTION ALLEGATIONS

64.     Plaintiff brings this action as a class action under Rule 23 of the Federal Rules of Civil Procedure, on behalf of a proposed nationwide class (the "Class"), defined as:

> Any person in the United States who purchased or leased, other than for resale, a Class Vehicle.

65.     Class Vehicles are defined as follows:

2017, 2018, and 2019 model year Chevrolet Bolt.

66.     In addition, the state subclass is defined as follows:

**Arizona Subclass:** All persons in the state of Arizona who bought or leased, other than for resale, a Class Vehicle.

67.     The Class and Subclass satisfy the prerequisites of Federal Rule of Civil Procedure 23(a) and the requirements of Rule 23(b)(3).

68.     **Numerosity and Ascertainability:** Plaintiff does not know the exact size of the Class or identity of the Class Members, since such information is the exclusive control of Defendant. Nevertheless, the Class encompasses tens of thousands of individuals dispersed throughout the United States. The number of Class Members is so

numerous that joinder of all Class Members is impracticable. The names, addresses, and phone numbers of Class Members are identifiable through documents maintained by Defendant.

69.    **Commonality and Predominance:** This action involves common questions of law and fact which predominate over any question solely affecting individual Class Members. These common questions include:

i.      whether Defendant engaged in the conduct alleged herein;

ii.     whether Defendant had knowledge of the Battery Defect in the Class Vehicles when they placed Class Vehicles into the stream of commerce in the United States;

iii.    whether Defendant should have had knowledge of the Battery Defect in the Class Vehicles when they placed Class Vehicles into the stream of commerce in the United States;

iv.    when Defendant became aware of the Battery Defect in the Class Vehicles;

v.     whether Defendant knowingly failed to disclose the existence and cause of this defect in the Class Vehicles;

vi.    whether Defendant knowingly concealed the defect in the Class Vehicles;

vii.   whether Defendant's conduct as alleged herein violates consumer protection laws;

    viii.    whether Defendant's conduct as alleged herein violates warranty laws;

    ix.    whether Defendant's conduct as alleged herein violates other laws asserted herein;

    x.    whether Plaintiff and Class Members overpaid for their Class Vehicles as a result of the defect;

    xi.    whether Plaintiff and Class Members have suffered an ascertainable loss as a result of the defect;

    xii.    and whether Plaintiff and Class Members are entitled to damages and equitable relief.

70.    **Typicality:** Plaintiff's claims are typical of the other Class Members' claims because all Class Members were comparably injured through Defendant's substantially uniform misconduct as described above. The Plaintiff representing the Class is advancing the same claims and legal theories on behalf of himself and all other members of the Class that he represents, and there are no defenses that are unique to Plaintiff. The claims of Plaintiff and Class Members arise from the same operative facts and are based on the same legal theories.

71.    **Adequacy:** Plaintiff is an adequate Class representative because his interests do not conflict with the interests of the other members of the Class he seeks to represent; Plaintiff has retained counsel competent and experienced in complex class action litigation; and Plaintiff intends to prosecute this action vigorously. The Class's interest will be fairly and adequately protected by Plaintiff and his counsel.

72.     **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other detriment suffered by Plaintiff and the other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be virtually impossible for the Class Members to individually seek redress for Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not; individualized litigation creates a potential for inconsistent or contradictory judgments, increases the delay and expense to the parties, and increases the expense and burden to the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by this Court.

## ANY APPLICABLE STATUTES OF LIMITATION ARE TOLLED

### A.     Discovery Rule

73.     The tolling doctrine was made for cases of concealment like this one. Plaintiff and Class Members did not discover, and could not have discovered through the exercise of reasonable diligence, that the Class Vehicles had one or more design and/or manufacturing defects that caused the Class Vehicle batteries to overheat when fully charged.

74.     Plaintiff and Class Members had no realistic ability to discover the extent of the design and/or manufacturing defects until their Class Vehicles spontaneously set on fire and would have had no reason to individually believe that the problems with their vehicles were the result of a widespread design and/or manufacturing defect.

75.     Any statutes of limitation otherwise-applicable to any claims asserted herein have thus been tolled by the discovery rule.

## VI.     CLAIMS FOR RELIEF

### A.     Claims Brought on Behalf of the Nationwide Class

### COUNT ONE — FRAUD & FRAUDULENT CONCEALMENT

76.     Plaintiff realleges and incorporates all preceding allegations as though fully set forth herein.

#### 1.     Affirmative Misrepresentation

77.     Plaintiff asserts this affirmative misrepresentation theory of fraud on behalf of himself and the Nationwide Class or, in the alternative, on behalf of the State Class.

78.     Defendant advertised the Chevy Bolt as having a range of 238 miles and meeting consumers' needs as a vehicle that will take drivers "beyond their average daily driving needs—with plenty of range to spare."[51] Defendant communicated through these advertisements that the Class Vehicles were safe, durable, and would travel farther on a single charge than comparable vehicles.

---

[51] Exhibit O.

79.     Defendant has known since mid-2019 at the very latest that its representations regarding the material fact of the Class Vehicles range were false and intended Plaintiff and Class Members to rely on them. Even now, GM advertises the Chevy Bolt to have a driving range of 238 miles.[52]

80.     Plaintiff and Class Members did rely on Defendant's affirmative misrepresentations regarding the safety, durability, and range of the Class Vehicles when deciding to purchase or lease the Class Vehicles.

## 2.      Fraudulent Concealment: Range Representation

81.     Plaintiff asserts this fraudulent concealment theory on behalf of himself and the Nationwide Class or, in the alternative, on behalf of the State Class, against Defendant.

82.     The Class Vehicles that Plaintiff and Class Members purchased or leased were defective and unsafe because they were subject to spontaneous combustion when charging to a full or almost-full battery level due to the Defective Battery.

83.     Defendant intentionally concealed the Defective Battery and acted with reckless disregard for the truth when Defendant did not represent to consumers that there would be any issues with charging the Class Vehicles to 100% until over a year after they became aware of the risk of spontaneous combustion. Further, after Defendant

---

[52] *See* Exhibit J; Exhibit S; Exhibit T.

became aware of the risk of fire when charging the Class Vehicles in 2019, Defendant represented to consumers that the Class Vehicles could be safely charged to 100%.[53]

84.     Defendant had a duty to disclose this material safety information to Plaintiff and Class Members because of the safety hazards posted by the alleged defects and because Defendant had knowledge of the Defective Battery and took affirmative actions to conceal the Defect, including representing to consumers that the Class Vehicles could be safely charged to 100%.

85.     Plaintiff and Class Members did not know of the Defective Battery and could not have discovered it through reasonably diligent investigation until their vehicles spontaneously set on fire without warning, causing significant damage.

86.     But for Defendant's fraud, Plaintiff and Class Members would not have purchased or leased the Class Vehicles, or would have paid less for them. Plaintiff and Class Members have sustained damage because they purchased or leased vehicles that were not as represented and because they now own or lease Class Vehicles that are unsafe and never should have been placed in the stream of commerce. Accordingly, Defendant is liable to Plaintiff and Class Members for damages in an amount to be proven at trial.

87.     Defendant's acts were done wantonly, deliberately, with intent to defraud, in reckless disregard of the rights of Plaintiff and Class Members, and to enrich themselves. Defendant's misconduct warrants an assessment of punitive damages in an

---

[53] Exhibit Y.

amount sufficient to deter such conduct in the future, which amount shall be determined according to proof at trial.

## COUNT TWO — UNJUST ENRICHMENT

88.     Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

89.     Plaintiff and Class Members paid Defendant the value of non-defective, fully operational Class Vehicles with a driving range of 238 miles. In exchange, Defendant provided Plaintiff and Class Members with defective vehicles that are not fully operational and cannot be operated with a driving range of 238 miles without the risk of catching fire while charging.

90.     Further, Defendant provided Plaintiff and Class Members with Class Vehicles that are in need of significantly more charging time than advertised and a reduced range. Plaintiff provided Defendant GM with the value of a vehicle with none of these defects.

91.     As such, Plaintiff conferred value upon GM which would be unjust for GM to retain.

92.     As a direct and proximate result of GM's unjust enrichment, Plaintiff and Class Members have suffered and continue to suffer various injuries. As such, they are entitled to damages, including but not limited to restitution of all amounts by which GM was enriched through its misconduct.

## COUNT THREE — VIOLATION OF THE MAGNUSON–MOSS WARRANTY ACT
## (15 U.S.C. § 2301, *et seq.*)

93.     Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

94.      Plaintiff is a "consumer" within the meaning of the Magnuson–Moss Warranty Act, 15 U.S.C. § 2301(3).

95.     Defendant is a "supplier" and a "warrantor" within the meaning of the Magnuson–Moss Warranty Act, 15 U.S.C. § 2301(4)–(5).

96.     The Class Vehicles are a "consumer product" within the meaning of the Magnuson–Moss Warranty Act, 15 U.S.C. § 2301(1).

97.     The Magnuson–Moss Warranty Act, 15 U.S.C. § 2301(d)(1) provides for a cause of action for any consumer who is damaged by the failures of a warrantor to comply with a written warranty.

98.     Defendant's representations as described herein that Class Vehicles sold to Plaintiff and Class Members have an estimated range of "238 miles" on a fully charged battery are written warranties within the meaning of the Magnuson–Moss Warranty Act, 15 U.S.C. § 2301(6).[54]

99.     Through written and implied warranties, GM warranted that the Class Vehicles are free from defects, of merchantable quality, and fit for their ordinary and represented use.

---

[54] *See* Exhibit J; Exhibit S; Exhibit T.

100. GM breached the warranties as described herein. Contrary to Defendant's representations, Plaintiff and other Class Members are faced with the choice of limiting their battery charge to 90% and accepting the resulting reduced range or be subjected to the risk of potential car fires. As such, the Class Vehicles do not perform as promised and are unfit and unreasonably dangerous for ordinary use.

101. Defendant knew, or should have known, of the Defective Battery in the Class Vehicles.

102. Defendant knew, or should have known, that it's representations regarding the capabilities of the Class Vehicles were false, yet proceeded with a multi-year advertising campaign through which GM promised consumers that the Class Vehicles had a range of 238 miles on a full charge, and that the Class Vehicles could be safely charged to 100%.

103. Plaintiff and Class Members were damaged as a result of Defendant's breach of warranty because they received a product incapable of performing as Defendant represented without extreme risks to Plaintiff's and Class Members' safety, rendering the Class Vehicles less valuable than as represented.

**B.      Claims Brought on Behalf of the Arizona Class**

### COUNT FOUR — BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### ARIZ. REV. STAT. ANN. § 47-2A212

104. Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

105.    Plaintiff brings this action on behalf of himself and the Arizona State Subclass against Defendant.

106.    GM is a merchant with respect to the Class Vehicles. *See* ARIZ. REV. STAT. ANN. § 47-2314(A).

107.    The Class Vehicles are goods within the meaning of ARIZ. REV. STAT. ANN. § 47-2314.

108.    As such, Defendant was obliged to provide Class Vehicles that were fit for their ordinary purpose. *See* ARIZ. REV. STAT. ANN. § 47-2314(B)(3).

109.    The Class Vehicles are at risk of spontaneous combustion when charged to full or almost-full battery levels, which Defendant represented was appropriate and safe. The Class Vehicles are thus not fit for their ordinary purpose of transporting the driver and passengers in reasonable safety during normal operation.

110.    Defendant breached the implied warranty that the Class Vehicles were appropriate and safe for ordinary use by marketing, distributing, and selling and leasing the Class Vehicles with the Defective Batteries.

111.    These defects existed at the time the Class Vehicles left Defendant's manufacturing facilities and at the time the Class Vehicles were sold to Plaintiff and the Class Members.

112.    As a direct and proximate result of these breaches, Plaintiff and the Arizona Class have suffered various injuries, included diminution in value of the Class Vehicles.

## COUNT FIVE — BREACH OF EXPRESS WARRANTY
### ARIZ. REV. STAT. ANN. § 47-2313

113.    Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

114.    Plaintiff brings this action on behalf of himself and the Arizona State Subclass against Defendant.

115.    Defendant expressly warranted through statements and advertisements that the Class Vehicles were of high quality, would work properly and safely, and could be safely fully charged for a driving range of 238 miles. *See* ARIZ. REV. STAT. ANN. § 47-2313.

116.    GM breached this warranty by knowingly selling vehicles equipped with Defective Batteries that could not be safely charged to 100%, and had a significantly reduced driving range.

117.    Plaintiff and the Arizona Class have been damaged as a direct and proximate result of Defendant's breaches in that the Class Vehicles purchased by Plaintiff and the Arizona Class were and are worth far less than what Plaintiff and the Arizona Class Members paid to purchase them.

118.    The Class Vehicles were defective as herein alleged at the time they left Defendant's factories, and the vehicles reached Plaintiff and the Arizona Class Members without substantial change in the condition in which they were sold.

119.   As a direct and proximate result of these breaches, Plaintiff and the Arizona Class have suffered various injuries, included diminution in value of the Class Vehicles.

## COUNT SIX — VIOLATION OF THE ARIZONA COMSUMER FRAUD ACT
### ARIZ. REV. STAT. ANN. § 44-1521 *et seq.*

120.   Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

121.   Plaintiff brings this action on behalf of herself and the Arizona State Subclass against Defendant.

122.   Arizona prohibits "The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise." ARIZ. REV. STAT. ANN. § 44-1522(A).

123.   As alleged herein, Defendant advertised the Class Vehicles to have a range of 238 miles and that the Class Vehicles could be safely charged to 100%.

124.   Defendant intended that consumers would rely on these misrepresentations, inducing Plaintiff Walker and Class Members to purchase the Class Vehicles over comparable other vehicles.

125.   Plaintiff and Class Members did, in fact, rely on these representations when choosing to purchase the Class Vehicles over comparable other vehicles.

126.    Plaintiff and Class Members are therefore entitled to damages in an amount to be proven at trial.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Class, prays that this Court:

A.      Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Nationwide Class and Subclasses as defined above;

B.      Appoint Plaintiff as a representative of the Nationwide Class and applicable State Classes and their counsel as Class Counsel;

C.      Award all actual, general, special, incidental, consequential damages and restitution to which Plaintiff and Class Members are entitled;

D.      Award pre- and post-judgment interest on any monetary relief;

E.      Grant appropriate injunctive relief, including an order requiring Defendant to repair the Class Vehicles pursuant to its obligations under the terms of the Warranty;

F.      Determine that GM is financially responsible for all Class notice and administration of Class relief;

G.      Award reasonable attorney fees and costs; and

H.      Grant such further relief that this Court deems appropriate.

## VIII.  DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial for all claims so triable.


DATED this 11th day of February, 2021.

KELLER ROHRBACK L.L.P.


By *s/ Gretchen Freeman Cappio*
  Gretchen Freeman Cappio (P84390)
  Lynn Lincoln Sarko
  Ryan McDevitt (P84389)
  Emma Wright
  1201 Third Avenue, Suite 3200
  Seattle, WA 98101
  (206) 623-1900
  Fax (206) 623-3384
  gcappio@kellerrohrback.com
  lsarko@kellerrohrback.com
  rmcdevitt@kellerrohrback.com
  ewright@kellerrohrback.com


  Zachary C. Schaengold, *admission forthcoming*
  Justin C. Walker, *admission forthcoming*
  Markovits, Stock & DeMarco, LLC
  3825 Edwards Road, Suite 650
  Cincinnati, OH 45209
  (513) 651-3700
  Fax: (513) 665-0219
  zschaengold@msdlegal.com
  jwalker@msdlegal.com

  *Attorneys for Plaintiff*